# EPHRAIM SAVITT
*Attorney at Law*

260 MADISON AVENUE
SUITE 2200
NEW YORK, NEW YORK 10016
WWW.SAVITTESQ.COM

(212) 679-4470
FAX: (212) 679-6770
EPHRAIM@SAVITTESQ.COM

April 10, 2014

**BY ECF and HAND DELIVERY**
**Honorable Raymond J. Dearie**
**U. S. District Court**
**Eastern District of New York**
**225 Cadman Plaza East**
**Brooklyn, New York 11201**

Re:   **United States v. Alejo Polanco**

Docket No. 08 CR 065 (RJD)

Dear Judge Dearie:

My client Alejo Polanco is to be sentenced on July 24, 2014. This sentencing letter aims straight to the point, and eliminates the boilerplate string cites and judicially-crafted general pronouncements that I can easily incorporate, in the span of minutes, from my vast computer memory bank, with which Your Honor is entirely familiar and, I suspect, Your Honor is routinely presented in defense sentencing submissions. So why waste time on the broad pronouncements and string cites? Instead, let's get down to what matters in this sentencing proceeding.

a) **Sentencing recommendation:**

I am respectfully asking the court to implement the leniency and individualized sentencing powers that the Booker non-binding guidelines world affords and favors, and a

system where sentencing discretion has been restored, at least in large measure, to the sentencing court from the previously stranglehold discretion of the prosecution. The PSR recommends a life sentence for my client. (PSR Recommendation, Feb. 7, 2014, at page1). It would be surprising, yet nevertheless, fair and just for the government to disagree with that recommendation, and agree with my recommendation. I am respectfully recommending that the Court impose a total sentence of 25 years for Polanco. That is, as the Court is aware, the minimum mandatory prison sentence that Polanco would serve had he been convicted of the intentional or felony murder of Liliana Colmenares in one the New York State courthouses a few blocks away. Such a sentence is warranted, under the 18 U.S.C. 3553 (a) sentencing factors, on a number of factual grounds, as discussed below.

b) **Objections to PSR:**

In our February 24th letter to the probation officer (Exhibit A), we set forth our objections to the PSR. The PSR listed 20 Hobbs Act robberies in which the defendants in this case were involved. Polanco was alleged to have participated in 20 of those robberies. We objected to the allegations that Polanco was involved in robberies designated as nos. 5 and 6. (Exhibit A, pages 1-3).

Additionally, we objected to the allegations, as to robbery no. 13, that Polanco pointed a gun at a child and then pistol-whipped a man during the course of that robbery. (Exhibit A, pages 3-4). Those allegations were based on the testimony of cooperator Batista-Tavares, and were uncorroborated by any other testimony or evidence. It was Tavares, after all, who on cross-examination couldn't remember how many robberies he had committed. Tavares's accuracy and reliability were best described by him when explained that "if I told you 50, it could be a hundred, it could be 40. I can't specify it because I did so many robberies, I can't really remember

2

all of them." (Trial tr. page 590, lines 19-24). If only the jury had accepted Tavares's testimony that he was told that co-defendant Edwin Mendez shot Liliana Colmenares, which was not at all in harmony with the government's prosecution theory, the testimony of other cooperators and ultimately the jury verdict. Suffice it to say that Tavares, who had been facing the death penalty for his involvement in murder and God knows how many dozens of armed robberies of drug dealers and ordinary law abiding citizens, as well, has eviscerated his prospect for a life imprisonment sentence by testifying against Polanco. And no less an authority than Tavares himself actually disavowed his accuracy for details and simple matters, such as the extent of his own criminality.

We also objected to double counting miscalculations in the PSR's guidelines calculus as to robberies nos. 2 and 12. (Exhibit A. page 4). We also objected to the PSR's failure to include mitigating background and family information about our client from his long-time girlfriend Maria Paula de Garcia, with whom he has a young daughter Heidi Polanco, and whose teenage daughter Rachel Garcia he raised as his own daughter, during an over decade-long relationship. (In response, P.O. Jaime Turton has contacted me to get an updated telephone information for Ms. Garcia, who works long hours as a home health attendant to support herself and her 2 daughters, ever since Polanco was arrested nearly 8 years ago in 2006. We await his report in an upcoming PSR Addendum.). Finally, we advised that we would seek a Fatico hearing as to our factual objections.

In its letter to Probation dated March 7, 2014 (Exhibit B), the government, although adhering to its "belief" that the challenged PSR allegations were accurate, nevertheless advised that it "does not seek a Fatico hearing. The government further stated that it "does not object to

3

modifying those paragraphs in accordance with the defendant's objections." Hopefully, Probation will concur and modify the PSR with an addendum reflecting these uncontested factual revisions.

**c) Requested Fatico hearing on the issue of whether life imprisonment or a term of years is the appropriate sentence on the felony murder conviction (count four):**

Yet, we ask for a <u>Fatico</u> hearing on the more comprehensive question in these sentencing proceedings, and the one that will make a difference in whether Alejo Polanco, who will be 48 years old at the date of his sentencing, will get an opportunity to live out the balance of his life as a senior citizen in his native Dominican Republic, with the occasional company of his then-adult daughters and hopefully, his grandchildren. The murder with a firearm statute, 18 U.S.C. 924 (j)(2), provides for sentencing "for any term of years or life." The advisory sentencing guidelines notwithstanding, the plain and ordinary meaning of this alternative sentencing scheme affords the sentencing court with the discretion to decide which path to take at the fork in the road, and assuming that the right path, from my perspective, is taken, what term of years is "sufficient, but not more than necessary" to achieve the Section 3553(a) sentencing goals.

Let's enumerate the reasons why the "term of years" approach is appropriate for Alejo Polanco, with some explanatory information pertaining to each reason listed:

**1. The Colmenares shooting was unintentional; and**

**2. Polanco proffered fully and truthfully, but the government decided that his cooperation was not necessary.**

True, Alejo Polanco participated in 9 robberies, in one of which he discharged the firearm that killed Liliana Colmenares. But the shooting was entirely unintentional and accidental. As he told prosecutors and agents during a proffer session before I was appointed as his attorney

4

several years ago, he did not intend to shoot the firearm he was given by a co-defendant at anyone, much less kill anyone, during the June 10, 2001 robbery of the Washington Heights apartment drug stash of Lionel Bohorquez (the man in the video from Colombia who acknowledged that he was "shot in the ass."). During that proffer session, Polanco was fully debriefed, and provided answers that, as I was informed, were found to be credible by the government. That finding, I believe, included his averment that he shot Ms. Colmenares, who was pregnant, accidently after she surprised him by grabbing for the gun he was holding. The PSR, in fact, recites that after Danilo Arjuelo (who died a few years before the Polanco trial), with gun drawn, entered the apartment and struggled with Bohorquez for control of the gun, which fired and resulted in the latter being "shot in the buttocks," The PSR further reports that "Colmenares came out of the back bedroom…approached Polanco and tried to grab the gun he had." As a result, the gun in Polanco's hand discharged a round in Colmenares' face, which resulted in her death. (PSR, page 6, paragraph 14).

It should be noted that Polanco has desired for years to cooperate, both in this and Southern District. I cannot speak to why this process was not pursued at an earlier juncture by predecessor counsel in both districts. It is apparent that someone fell asleep at the switch or simply did not pursue the cooperation program with the alacrity required to avoid the client's information from becoming dated, as happened in Polanco's case. Perhaps had Polanco been possessed with a working ability to speak English and a more aggressive personality, the process would have been timely, his information deemed timely and he would have appeared as a witness for the folks at the table closer to the jury, rather than a defendant sitting at the back bench with no real option to testify because he had already spilled his guts fully and truthfully at the proffer session.

5

Unintentional though he shooting was, as every cooperator who testified at trial acknowledged, accidental felony murder results in the same outcome as intentional homicide. Therein lies the crux of both the problem confronting Polanco before he proceeded to trial and which, at this point in the case, also provides a solid factual basis for choosing a term of years over life as his punishment.

A review of the trial record leaves no doubt that Polanco was haunted by, and anguished over, the Colmenares shooting. He never meant to shoot anyone, much less kill a pregnant woman who was the girlfriend of the drug dealer the Arjuelo crew was setting up for a drug and money robbery. No one who testified had actually been in the apartment when the shooting occurred. Instead, the cooperators were reporting, on their cross examinations, what they had heard from Arjuelo and Polanco. Although some of the cooperators' reports, diverge in details, recollection and accuracy, they are in complete harmony as to Polanco's lack of intent to kill or shoot.

Fabio Ramos testified that after the robbery, Polanco had told him, "I didn't mean to kill her. I didn't mean to kill her. The woman came at me and the gun went off. All I was going to do is hit her with it." (Trial tr. page 131, lines 16-18). Ramos repeated that description, when he testified that Polanco advised him, "Oh, I wasn't trying to kill her. I wasn't trying to kill her. That was an accident. I just wanted to quiet her down by pistol whipping her, but the gun went off." (Trial tr. page 134, lines 2-4).

Adan Martinez testified that, after that robbery, Danilo Arjuelo informed that "he went to a job with Hondo. And at the door when they were going to go in and do a job, there was a struggle between Hondo and a lady whom he hit with a revolver. At that moment the gun, the

revolver went off, it went off in the girl's face. That's what he told me." (Trial tr. page 349, line 23 to page 350, line 4).

Antonio Henriquez, in a less descriptive manner, concurred by testifying, "I just remember that Danilo said that in the next robbery he was going to give a hammer to Alejo Polanco." (trial tr. page 701, lines 20-21).

Finally, although not a sworn witness, yet obviously entirely believable, as the jury verdict indicated, AUSA Nathan Reilly, in the government's main summation, capsulated the cooperators' accounts by mimicking what Polanco was supposed to have said to them, "The woman came at me and the gun went off. All I was going to do was hit her with it." (Trial tr. page 903, lines 10-11).

Actually, the forensics introduced at trial included the finding by the medical examiner that Liliana Colmenares had gunshot residue on the inside of right palm. As the witness acknowledged, and as counsel argued to the jury, the positioning of the residue on her hand is consistent with the gun being discharged as she grabbed it while it was in Polanco's hand. Pistol whipping was never under consideration. Nothing was. The gun discharged as the victim grasped it. That still makes the shooting, albeit unintentional, felony murder. If there is any killing to which the statutory sentencing alternative of a term of years applies, it is precisely this one, where the killing was accidental, distinguishing it from intentional murder of the victim or the accidental killing of the victim but with the intent to kill a non participant in the underlying felony offense. Otherwise, why would Congress have provided this alternative? Yet, neither of these intention-based crimes occurred her.

**3. Polanco only participated in robberies until 2003, five years before his arrest, involving only drug dealer "victims":**

As the PSR recites, the robberies in which Polanco participated began in 2000 (the SDNY offense to which Polanco pleaded guilty and for which he faces 20 years) and concluded at some point "in 2003." (PSR, pages 5-9). True, the fact that Polanco was involved in 9 Hobbs act robberies in connection with the charged conspiracy in this case and another one which the SDNY prosecuted, hardly covers him with glory. But a 25 year sentence, followed by automatic deportation for life more than adequately punishes him for those offenses, including the accidental Colmenares killing. It is noteworthy, therefore, that there is absolutely no evidence of which I am aware that supports the PSR Recommendation's sweeping allegation that Polanco was an active member of the charged conspiracy through 2008, when he was indicted in this case. For one thing, he was arrested for the SDNY case in 2006, and was in custody since then. More significantly, however, the Polanco name is not included in any of the robberies described in the PSR past 2003. Nor is his name included in robberies of non-drug dealers, as are some of the cooperators who testified for the government and will be free many years before Polanco will, even if sentenced to a term of years.

**4. Polanco will be over 63 years old at the time of his earliest possible release on a 25 year sentence; still alive, but statistically too old to revert to Hobbs Act activities in this country or any other:**

Alejo Polanco will turn 48 in June. He has been in detention on this case since his indictment in August 2008. If sentenced to 25 years, he will get his maximum 15% good time credit. He has never committed any disciplinary offense in detention. He is a mild-mannered man with a soft-spoken way of speaking. He will not deviate from his compliance with the rules in a

8

permanent facility. That's not his nature, he complies and follows directions, as he did as one of Arjuelo's flunkies, pretty much as one of the Dickensonian street urchins followed Fagin's directions. Well, Fagin is dead, the urchin is turning 48 and he is behaving.

A 25 year sentence means 300 months imprisonment. The good time discount is 45 months, reducing the sentence to 255 months. By the time he is sentenced in late July, he will have served 71 months, which yields another 184 months remaining for his prison service before he is deported. That translates to 15.33 years from his 48th birthday, when he is 63.3 years old. The likelihood of recidivism at that age is statistically very low. For Alejo Polanco, the person who follows the institutional rules, who truthfully proffered, who was profoundly remorseful for shooting Ms. Colmenares, who will definitely be deported, recidivism is out of the question.

**Conclusion:**

Alejo Polanco committed very serious crimes. Under the defense recommended formula, he will serve the same sentence as a first time defendant convicted of felony murder in the state system. He will have forfeited the best years of his life, miss out on the development of his daughter from child to adult and suffer losses in the family without being able to hug loved ones at funerals or dance with them at weddings. He will not only miss good times in life, or continuing his relationship with the mother of his child or developing new relationships or friends. He will be the institutionalized old guy in his native country as a 63 year old man who grew old without experiencing the joys of freedom and the companionship of the persons who mean the most to him. Pretty much like the old guy, played by the late great actor James Whitmore, who hung himself after his release in the film "The Shawshank Redemption."

He is a genuinely good man, and devoted to his family and children. A number of character letters, unfortunately for the CJA costs in this case, entirely in Spanish are being translated into English for submission to the Court in a few weeks. His personality is in stark contrast to the kind of crimes he committed.

I respectfully ask that my client be given the opportunity to live out the final years of his life outside the confines of a federal prison. I also request that the Court recommend that he be designated to a facility as close to New York as possible to facilitate family visits.

I thank Your honor for your courtesy and consideration.

Respectfully submitted,

*Ephraim Savitt/rp*

Ephraim Savitt, Esq.

Attachments

cc: Clerk of the Court (RJD)
    AUSA Daniel Silver (ECF and Email)
    AUSA Soumya Dayananda (ECF and Email)
    AUSA Nathan Reilly (ECF and Email)