# EPHRAIM SAVITT
*Attorney at Law*

260 Madison Avenue  
Suite 2200  
New York, NY 10016  
www.savittesq.com

(212) 679-4470  
Fax (212) 679-6670  
Ephraim@savittesq.com

February 24, 2014

BY EMAIL  
*Jaime_Turton@nyep.uscourts.gov*  
Jaime L. Turton  
U.S. Probation Officer  
147 Pierrepont Street  
Brooklyn, N.Y. 11201

Re: United States v. Alejo Polanco, et al.,  
Criminal Docket 08 CR 065 (RJD)

Dear Officer Turton,

Pursuant to Fed. Crim. P. 32(f)(1), we submit this letter to set forth our client Alejo Polanco's objections to the presentence report ("PSR"). This letter focuses almost exclusively on challenges to the guidelines calculations and to the evidentiary basis upon which they were made. A more complete, detailed presentation of points will be made within our forthcoming sentencing submission.

**a.     The Offense Conduct**

With respect to the Instant Offenses section beginning on page 5 of the PSR, there are a total of twenty robberies charged under Count Two of the Hobbs Act Conspiracy against Polanco and his co-defendant Emiliano Vasquez "…11 of which are directly related to the defendant" *(PSR para. 93 pg 20)*. Our client denies his involvement in Robberies #5, and #6, which are described in paragraphs 19 and 20 on pages 7 and 14, of the PSR and whose corresponding offense level computations are on page 22. Mr. Polanco readily admits his involvement in the other nine

EXHIBIT A

robberies, but maintains he was never involved in any means in the planning or commission of robberies #5 and #6.

Fabio Ramos aka Pappo was the first government cooperator to testify, and had previously pled guilty to the same Hobbs Act Conspiracy charge found in the third superseding indictment, pursuant to a cooperation agreement with the government. He is a named co-conspirator and participant in robberies #5 and #6 but his testimony is silent as to the commission of these robberies and their participants. On direct examination, the government elicited no testimony regarding these two robberies from Mr. Ramos.

Adan Martinez was the second government cooperator to testify, and he had previously pled guilty to the same Hobbs Act Conspiracy charge pursuant to a cooperation agreement with the government. Mr. Martinez was not a named participant in robberies #5 and #6 and did not testify as to the commission of these robberies at trial.

Edwin Batista-Tavares was the third government cooperator to testify and he had pled guilty to the same Hobbs Act Conspiracy charge pursuant to a cooperation agreement with the government. Mr. Tavares was himself a participant in robbery #5, and testified that his partners in that robbery were: Antonio Henriquez, Edwin Mendez, Pappo (Fabio Ramos), and Patalarga (Emiliano Vasquez) *(See trial transcript pgs 538-539)*. Mr. Tavares *does not* name Alejo Polanco as a participant in this robbery.

Antonio Henriquez was the fourth and final government cooperator to testify, and he also had previously pled guilty to the same Hobbs Act Conspiracy charge pursuant to a cooperation agreement with the government. Mr. Henriquez did not testify as to the participants nor the commission of robberies #5 and #6 although he is a named participant in these robberies, and testimony to that effect was not elicited by the government on direct examination.

3

Nowhere in the transcript of the trial proceedings, is Mr. Polanco named as a participant in robbery #5, and thus the PSR's inclusion of Mr. Polanco in the commission of that robbery, and the resulting guidelines calculations of that robbery are in error and should be removed in their entirety.

As for robbery #6, Mr. Tavares, a participant in robbery #6, *did* name Mr. Polanco as a participant, but on cross examination revealed his memory was clouded. When asked by defense counsel how may robberies he was involved in, he responded "I couldn't specify that. Whether if I told you 50, it could be a hundred, it could be 40. I can't specify it because I did so many robberies, I can't really remember all of them." *(See pg 590, lines 19-24).* Furthermore, Mr. Tavares' claim was never corroborated on the stand, although the government could have elicited the testimony of co-conspirators and alleged co-participants Mr. Ramos and Mr. Henriquez. While each of these individuals took the stand for what seemed like an endless trip down Hobbs Act memory lane, they were never asked about their participation in these robberies at all. Our client vehemently denies participation in this robbery, and stands to gain nothing by an admission of participation in this crime, having already conceded his participation in 9 other robberies. As a strategic decision, counsel opted not to attack Mr. Tavares on his account of robbery #6 during cross examination, on the basis it would have sent strong indicators to the jury that our client was in fact involved in every other robbery recounted on the stand.

With respect to Robbery #13, our client objects to the findings that he pointed a gun at a child during the course of the robbery, and that he pistol-whipped a man. Again this is the testimony of Edwin Batista-Tavares, completely uncorroborated by any other co-conspirator. Mr. Polanco denies committing this atrocity and maintains that this recollection of events is simply untrue, and that there are other co-conspirators who can support him. The PSR considers this finding, "an aggravating factor the Court may consider at sentencing" *(para. 60 pg. 15)*. For this reason, we intend to request a Fatico hearing in our sentencing submission. A Fatico hearing

4

will give the Court an opportunity to gain insight as to the moral character of our client, which is a crucial aid to the Court when taking upon the heavy task of sentencing him.

**b.    Guidelines Analysis- Enhancements**

Due to our client's conviction of Count Two: Hobbs Act Robbery Conspiracy, each of the robberies of each narcotics trafficker are analyzed separately for the purpose of guidelines calculations.  Two of these robberies were given additional specific offense characteristic enhancements without any foundation, thus driving up their guidelines calculus.

In robbery #2, the participants, including Mr. Polanco, robbed approximately 500lbs of marijuana.  In this robbery only a controlled substance was taken, no money was stolen from the victim.  Nevertheless in addition to a 1-level enhancement for a controlled substance per USSG §2B3.1(b)(6), which is warranted, a 2-level enhancement was given for "estimated loss of between $200,000 and $250,000" per USSG §2B3.1(b)(7)(C) *(See para. 97 pg. 21)*.  This 2-level enhancement is inappropriate as no money was stolen from the victim.  The PSR arrived at this 2-level enhancement by converting the poundage of marijuana to street value cost, and reconstructing it as an "estimated loss" essentially double-counting the proceeds of the robbery for purposes of guidelines enhancement.

In robbery #12, 2 kilograms of cocaine were stolen, as stated in testimony during trial, these kilos were later sold for $39,000.  The PSR not only calculated a 1-level enhancement for a controlled substance per USSG §2B3.1(b)(6), which was warranted, but added a 1-level enhancement for "a loss over $10,000" per USSG §2B3.1(b)(7)(B) *(see para. 153, pg. 24)*.

Polanco and his coconspirators were members of a group which robbed narcotics dealers for their products in order to make a living, this is a known irrefutable fact.  In order to make a living off the robbery of a controlled substance that product needs to be converted to cash, which means it must be sold.  The process of converting narcotics into hard currency does not in and of

5

itself result in additional losses to narcotics traffickers, when they themselves would have sold those drugs for currency. The theft of drugs is one crime, one loss. The guidelines applications do not instruct on this manner of double counting, and this is not a fraud case or similar economic offense for purposes of valuing legitimate objects stolen from a law-abiding victim to formulate a loss estimate for construction of a sentence and for just punishment. By contrast, to highlight this incongruence, in robberies #10, 13 and 14, both a controlled substance and currency were stolen from narcotics traffickers, and separate enhancement calculations given under each robbery were appropriate and warranted because they were two distinct losses. It cannot be interpreted that the policy of the guidelines would be to quantify narcotics in terms of monetary loss to increase punishment for those who rob from narcotics traffickers, these victims are not a special class in need of protection.

**c.     Offender Characteristics**

There are no per se objections to the section in the PSR entitled "Offender Characteristics" beginning on page 29 and ending on page 33. However it is worth noting that a key individual Maria Paula de Garcia, a virtual treasure trove of information pertaining to Mr. Polanco's character, was never consulted for contribution to this PSR. She is the mother of his child Heidi Polanco, and they were in a relationship for over a decade. According to the PSR, Ms. De Garcia "returned two calls during the evening hours" but no further course of action was taken on the part of the Probation Office to complete any contact *(see para. 207 pg 29)*. It is the opinion of counsel and the desire of our client that contact should be made with Ms. De Garcia and a bona-fide attempt to gather information on Mr. Polanco should ensue forthwith. In light of the fact that the PSR makes a recommendation of life sentence, due diligence should be the focus in the compilation of facts relating to the background of the defendant.

**d.     Guideline Provisions**

In paragraph 233, the PSR concludes that Polanco faces a calculated offense level of 44 and is within criminal history category I, for which the advisory sentence is life. The statute under Count Four however calls for a term of imprisonment "for any term of years *or* life" *(see 18 USC 924(j)(1))*. We do not argue with the guidelines calculations rather we contest the application to our client. A preview of our sentencing submission presentation is in order at this juncture, and we submit that our client be sentenced to a term of years over a term of life. The reasoning is twofold: the killing of Liliana Colmenares during the commission of the robbery of narcotics traffickers while atrocious, was not intentional. The record is replete with testimony from cooperators that the killing was accidental. Polanco therefore lacked the requisite mens rea of intent to cause the death of Liliana Colmenares, and should not be forced to forfeit his own life as punishment. Secondly, there are glaring disparities between the sentence Polanco faces and those faced by his co-conspirators turned cooperators, all of whom have admitted to committing numerous atrocities during their long tenure as hardened criminals. For these reasons which will be more fully elaborated in our sentencing submission, we will submit to the Court that a more lenient sentence is appropriate in this unique instance.

We thank you for your courtesy,

/s/

Ephraim Savitt
Natasha D. Marosi
*Attorneys for defendant Alejo Polanco*

CC: BY ECF Filing

Honorable Raymond J. Dearie

AUSA Dan Silver
AUSA Soumya Dayananda
AUSA Nathan Reilly

Michael Hurwitz, Esq.